**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

XORAN HOLDINGS LLC, and
XORAN TECHNOLOGIES LLC,

       Plaintiffs,

                            Case No. 16-13703

v.                            HON. DENISE PAGE HOOD

DAVID LUICK and TUNGSTEN
MEDICAL NETWORK, LLC,

       Defendants.

_____/

## ORDER REGARDING DOCKET Nos. 16, 18 and 21

## I.   INTRODUCTION

Plaintiffs filed this action seeking an order enjoining Defendants from using and disclosing Plaintiffs' trade secrets and confidential and proprietary information and competing against Plaintiffs. Plaintiffs assert Luick has violated express contractual obligations he made pursuant to an employment agreement ("Employment Agreement") he executed as an employee of Plaintiff Xoran Technologies LLC ("Xoran"). Defendants counter that Plaintiffs have not identified any particular piece of information entitled to trade secret protection, nor have Plaintiffs demonstrated actual or threatened misappropriation of any trade secrets. After Plaintiffs filed a

1

motion for temporary restraining order against Defendants, the parties entered into a Stipulated Order on November 4, 2016 ("Stipulated Order"). Dkt. No. 14.

On November 18, 2016, Defendants filed a Motion to Dismiss Plaintiffs' Complaint for Lack of Subject Matter Jurisdiction. Dkt. No. 16. On November 22, 2016, Plaintiffs filed a Motion to Dismiss Defendants' Counterclaim. Dkt. No. 18. On December 7, 2016, Plaintiffs filed an Amended Motion for Order to Show Cause Why Defendant Should Not be Held in Contempt. Dkt. No. 21. All three motions have been briefed, and a hearing was held on January 25, 2017.

## II.   <u>BACKGROUND</u>

From September 2011 through May 2016, Luick was employed by Xoran Technologies LLC as Director of Sales (he began his employment in 2007 as Project Manager). Xoran is a research and development company based in Ann Arbor, Michigan, that has developed, patented and marketed a line of small, specialized CT scanners and related products for the United States and international markets, particularly low-dose radiation, cone-beam based CT scanners for use in office and operating rooms. Dkt. No. 1, ¶¶10-11. As Director of Sales, Luick was required to sign the Employment Agreement as a condition of his employment, which he did on or about September 18, 2011. Dkt. No. 1, Ex. 1. The Employment Agreement signed by Luick sets forth the following relevant provisions:

# **RECITALS**

* * * * *

B.     Xoran possesses Confidential Information (hereinafter defined in Paragraph 6) that is a valuable and unique assets of Xoran. In connection with Employee's employment, Employee holds, or will hold, a position that will provide Employee with access to and knowledge of Confidential Information of Xoran and of clients and customers of Xoran.

* * * * *

6.     <u>Non-Disclosure of Information</u>.  Employee acknowledges that much, if not all, of the material and information related to the products, technology, software and hardware, techniques, and othr business affairs of Xoran and its affiliates, including without limitation, and and all Work Product (as defined in Paragraph 5.1 of this Agreement), discovered or created pursuant to this Agreement, and the business affairs and information of Xoran and its customers and clients (including but not limited to, any business plans, practices and procedures, pricing information, sales figures, profit or loss figures, information relating to clients, suppliers, sources of supply and customer lists, customer identity, pricing information, and business development plans), which have or will come into Employee's possession or knowledge in connection with Employee's performance under this Agreement, consists of confidential and proprietary data of Xoran and its affiliates (collectively, "Confidential Information"). . . . Employee further agrees not to make use of Confidential Information for Employee's own benefit, either during the term of Employee's employment with Xoran of [sic] after the termination of such employment.  In the event of any breach of this confidentiality obligation by Employee, Employee acknowledges that Xoran would have no adequate remedy at law because the harm caused by such a breach would not be easily measured and compensated for in the form of damages.  Accordingly, Employee hereby waives his/her right to contest any equitable relief sought by

Xoran, other than Employee's right to contest the question of whether a breach has occurred.  Employee hereby waives the requirement of any bond being posted as security for such equitable relief.

* * * * *

8.1　　Term of Non-Competition.  The "Term of Non-Competition" means the period beginning on the date of this Agreement and continuing for a period of twelve (12) consecutive, full calendar months following the termination of Employee's employment for any reason.

8.2　Prohibited Activities.

* * * * *

8.2.2 During the Term of Non-Competition, Employee will not provide directly or indirectly, individually or as a principal, officer, director, employee, shareholder (other than a holder of fewer than 5% of the outstanding shares of a publicly-traded company), consultant, partner, joint venturer, agent, equity owner or in any other capacity whatsoever, a "Competing Service" to any entity regardless of whether it is a sole proprietorship or a corporation, partnership, business association, or other entity.  The term "Competing Service" includes, but is not limited to, the design, development, sale, marketing, or distribution of the same or similar products and/or services that are provided by Xoran and its affiliates.  If any portion of this Paragraph 8.2.2 is deemed unenforceable by a court of law or arbitrator, the parties' agreement restricting Employee's ability to provide Competing Services shall be enforced to the fullest extent allowed by applicable law.

8.2.3  During the Term of Non-Competition, Employee will not, directly or indirectly, individually or on behalf of or in connection with any other person, entity or organization: (a) cause, encourage, direct, solicit, induce or attempt to induce any person who is or has been employed or retained by Xoran to leave the employ or services of Xoran, or in any

way interfere with the relationship between Xoran and any employee or consultant thereof; and/or (b) call on, solicit, have contact with, or service any customer, prospective customer, consultant, strategic partner, funding source, or other business relation of Xoran in order to (i) solicit business of the type provided by Xoran, (ii) induce or attempt to induce such person or entity to cease doing business with, or reduce the amount of business conducted with, Xoran, or (iii) in any way to interfere with the relationship between any such person or entity and Xoran.

* * * * *

11.10 Survival.  Employee hereby acknowledges that the rights and obligations of Employee and Xoran under all subparagraphs of Paragraphs 5, 6, 7, 8, 9, and 11 of this Agreement shall survive the termination of this Agreement.  Employee acknowledges and agrees that: . . . (iv) Xoran will be entitled to enforce this Agreement through a temporary restraining order, an injunction and/or other equitable remedies in the event of a breach, in addition to any other remedies available to Xoran (including, without limitation, monetary damages), without the requirement for posting a bond or security for such injunctive relief; and (v) injunctive relief will not deprive Employee of an ability to earn a living because he/she is qualified for many positions which do not otherwise necessitate the breach of any provision of this Agreement.

*Id.*

In May 2016, Luick resigned.  The parties dispute whether he resigned voluntarily or involuntarily, as Defendants contend that Luick was fired, a termination that Defendants claim was the result of Luick reporting misconduct by Xoran's Chief Executive Officer, Miodrag Rakic, to Xoran's Human Resources administrator.  Xoran later discovered that Plaintiff had filed incorporation papers for

a new entity, Tungsten Medical Network, LLC ("Tungsten"), that Luick operated out of his home. Dkt. No. 1, Ex. 2. When Xoran learned that Defendants might be using Confidential Information (as defined in Section 6 of the Employment Agreement) to compete with Xoran, Xoran tried to address the issue with Luick without resorting to litigation, including sending a letter from counsel reminding him of his obligations. Dkt. No. 11, Ex. 3. Luick assured Xoran personnel that he was not using Confidential Information or competing with Xoran.

In September 2016, Xoran's President, Dr. David Sarment, saw Defendant Luick talking with representatives from Xoran's largest competitor at an industry conference. When Dr. Sarment approached Luick, Luick indicated that he was not competing with Xoran. Dkt. No. 11, Ex. 4 at ¶ 5. Luick stated that he had looked into other positions, but none of those options could "meet his salary expectations." *Id*. at ¶ 7.

On October 18, 2016, Plaintiffs filed a Complaint with the following five counts: (1) Misappropriation of Trade Secrets under the Defend Trade Secrets Act, 18 U.S.C. § 1836 ("DTSA"); (2) Injunctive Relief; (3) Misappropriation of Trade Secrets under the Michigan Uniform Trade Secrets Act, M.C.L. 445.1901 *et seq.*; (4) Breach of Contract (Luick only); and (5) Tortious Interference with a Contractual Relationship. Defendants filed an answer to the Complaint and Counterclaim on

November 1, 2016. On November 1, 2016, Defendants filed a Counterclaim for wrongful termination against Plaintiffs.

At the time Plaintiffs' filed their motion for temporary restraining order, Tungsten's website indicated that it is "experienced with these brands" and displayed the names "Xoran," "Morita," and "Carestream," a competitor of Xoran's. Carestream is the same competitor that Dr. Sarment had seen Luick speaking with at the conference. Contrary to Plaintiffs' statements, there did not appear to be any other reference to Carestream on Tungsten's website (and not anything that states Tungsten has a relationship with Carestream). Xoran also believed that Defendants are using a claimed (but non-existent) business relationship with Xoran to get access to Xoran's customers and then attempt to steer those customers away from Xoran by providing false information about Xoran's business. Dkt. No. 11, Ex. 3 at ¶¶ 18-21.

On November 4, 2016, the parties submitted, and the Court signed, a Stipulated Order that provided, in part, as follows:

> WHEREAS, The Employment Agreement contained certain non-compete provisions which are at issue in the current litigation, and which restricted Defendant Luick from certain activities Xoran for a period of 12 months from the date of termination ("non-compete period"); and

* * * * *

**IT IS HEREBY ORDERED AS FOLLOWS:**

1. Defendants will not use any work product derived in whole or in part from work product Luick or any other Xoran employee produced while working at Xoran unless otherwise publicly available.

2. With respect to this Order, Xoran Customer is defined as any specific location that currently has a Xoran product and/or limited or comprehensive service contract for the Xoran MiniCat, xCAT, XoranConnect, VetCAT, or CBCT Service Contract, or prospective customers that Luick was personally engaged in active sales discussions at the time of his termination.

3. Until the completion of the "non-compete period", Defendants will not (1) directly or indirectly initiate contact with any Xoran Customer; (2) offer to sell a competing product or service to any Xoran Customer, or assist or advise in any such transaction; (3) hold himself out as an agent of Xoran to any person; (4) take a position as an agent or executive of any Xoran competitor company, including but not limited to Carestream and Morita, in transactions involving Xoran Customers.

4. Defendants will not advertise a business affiliation with Xoran.

5. Defendants will not use, sell or otherwise disclose information about Xoran's product and service pricing that Luick learned while employed at Xoran, unless it is otherwise publicly available.

* * * * *

Dkt. No. 14.

## III.  ANALYSIS

### A.  Defendants' Motion to Dismiss

Defendants contend that the Court does not have federal jurisdiction over this case, as Plaintiffs' sole basis for jurisdiction is their claim pursuant to the Defend

Trade Secrets Act, 18 U.S.C. § 1836 *et seq.* ("DTSA"). Defendants argue that the DTSA claim should be dismissed for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). Then, once the DTSA claim is dismissed, Defendants suggest that the Court should dismiss the entirety of Plaintiffs' cause of action pursuant to Rule 12(b)(1) due to the lack of any other basis for federal subject matter jurisdiction.[1]

### 1. Standard of Review

A Rule 12(b)(6) motion to dismiss tests the legal sufficiency of the plaintiff's complaint. Accepting all factual allegations as true, the court will review the complaint in the light most favorable to the plaintiff. *Eidson v. Tennessee Dep't of Children's Servs.*, 510 F.3d 631, 634 (6th Cir. 2007). As a general rule, to survive a motion to dismiss, the complaint must state sufficient "facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The complaint must demonstrate more than a sheer possibility that the defendant's conduct was unlawful. *Id.* at 556. Claims comprised of "labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555. Rather, "[a] claim has facial plausibility when the plaintiff pleads

---

[1]Plaintiffs propose that the Court convert Defendants' Motion to Dismiss to a Rule 56 motion because Defendants rely on documents outside the pleadings. As the Court can resolve Defendants' Motion to Dismiss solely on the pleadings, the Court declines Plaintiffs' proposal.

factual content that allows the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678

(2009).

With respect to Rule 12(b)(1), the Sixth Circuit has held:

> Fed.R.Civ.P. 12(b)(1) provides for the dismissal of an action for lack of subject matter jurisdiction. A Rule 12(b)(1) motion for lack of subject matter jurisdiction can challenge the sufficiency of the pleading itself (facial attack) or the factual existence of subject matter jurisdiction (factual attack). *United States v. Ritchie*, 15 F.3d 592, 598 (6th Cir. 1994). A facial attack goes to the question of whether the plaintiff has alleged a basis for subject matter jurisdiction, and the court takes the allegations of the complaint as true for purposes of Rule 12(b)(1) analysis. *Id*.

> A factual attack challenges the factual existence of subject matter jurisdiction. In the case of a factual attack, a court has broad discretion with respect to what evidence to consider in deciding whether subject matter jurisdiction exists, including evidence outside of the pleadings, and has the power to weigh the evidence and determine the effect of that evidence on the court's authority to hear the case. *Id*. Plaintiff bears the burden of establishing that subject matter jurisdiction exists. *DLX, Inc. v. Commonwealth of Kentucky*, 381 F.3d 511, 516 (6th Cir. 2004).

*Cartwright v. Garner*, 751 F.3d 752, 759-60 (6th Cir. 2014).

2.    *Analysis*

Under the DTSA, information is a "trade secret" only if:

(A) the owner thereof has taken reasonable measures to keep such information secret; and

(B) the information derives independent economic value, actual or

potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

*Id*. § 1839(3). Under the DTSA, "misappropriation" is defined as the:

(A) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

(B) disclosure or use of a trade secret of another without express or implied consent by a person who—

(i) used improper means to acquire knowledge of the trade secret;

(ii) at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was—
(I) derived from or through a person who had used improper means to acquire the trade secret;

(II) acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or

(III) derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret; or

(iii) before a material change of the position of the person, knew or had reason to know that—

(I) the trade secret was a trade secret; and

(II) knowledge of the trade secret had been acquired by accident or mistake;

18 U.S.C. § 1839(5).

11

In their Complaint, Plaintiffs allege that, among other things:

> 16. Xoran has trade secrets rights in its ongoing confidential research and development work, non-patented innovative technology, business information, proprietary pricing models, customer contact lists (which include the peculiar needs of particular clients), cost, profit and sales data, development of accreditation support programs, development of selling strategies, bundled offerings, tiered pricing, financing, and related work product (collectively, the "Trade Secret Information.")

Dkt. No. 1, ¶ 16. Defendants argue that Plaintiffs have not adequately identified what the trade secrets were that Luick allegedly misappropriated. Defendants contend that the list of items set forth in Paragraph 16 of the Complaint is boilerplate language, as best exemplified by the final item ("and related work product"). Defendants also assert that many of the items listed are comprised of information likely available to any customer or prospective customer of Xoran. Citing 18 U.S.C. § 1839(3)(B) (information does not qualify as a trade secret if it is "readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information"). Defendants also assert that Plaintiffs had an obligation to describe or make specific reference to concrete documents of "trade secret" information allegedly misappropriated.

The Court finds that Defendants seem to be asserting a quasi-Rule 9 (fraud) argument that requires a heightened pleading standard. Defendants do not cite any authority that would support the Court concluding that: (1) Paragraph 16 does not

adequately allege that Plaintiffs had trade secret information; or (2) a heightened pleading requirement is necessary.

Defendants next suggest that Plaintiffs have not sufficiently pled that Xoran took "reasonable measures to keep [the alleged trade secret information] secret." Citing 18 U.S.C. § 1839(b)(3). The Court rejects Defendants': (a) contention that Plaintiffs allegations are insufficient; and (b) Defendants' reliance on a non-binding district court case from Illinois (holding that an agreement restricting an employee from using such information, in itself, was not enough). Citing *Fire 'Em Up, Inc. v. Technocarb Equip. (2004) Lt.*, 799 F.Supp.2d 846, 851 (N.D. Ill. 2011). As Defendants acknowledge, Plaintiffs alleged that Xoran: (1) takes "extensive measures to guard the secrecy of its Trade Secret Information;" and (2) requires its employees, including Luick, to "sign contracts which protect the Trade Secret Information and return and destroy all copies of the Trade Secret Information upon the termination of employment." The Court finds that Plaintiffs' allegations that they took reasonable measures to keep their trade secret information are sufficient for purposes of surviving a motion to dismiss.

Defendants next argue that Plaintiffs do not "plausibly allege" that Luick misappropriated Xoran's purported trade secrets. The parties agree that the only misappropriation theory asserted by Plaintiffs is that Luick is *using* Xoran's trade

secrets in violation of his Employment Agreement and the DTSA. Defendants acknowledge that Plaintiffs set forth a number of allegations but contend that Plaintiffs "fail[] to identify which, if any, of the information in [Plaintiffs'] laundry list of 'trade secrets' that Luick allegedly misappropriated, or how. Defendants propose that Plaintiffs' trade secret claim appears to be couched primarily on the theory that Luick, by continuing to work in the CT industry, *must* be misappropriating trade secrets." Defendants assert that theory, known as "inevitable disclosure," was rejected by Congress. Citing 18 U.S.C. § 1839(b)(3)(A)(i)(I) (providing that an injunction to prevent the actual or threatened misappropriation of a trade secret "shall be based on evidence of threatened misappropriation and not merely on information the person knows.").

The Court concludes that Defendants' argument lacks merit. Plaintiffs alleged that Luick "used Xoran's Trade Secret Information to compare Tungsten services and pricing to Xoran's services" in an email to Dr. Lewit Worrell." Dkt. No. 1, ¶ 34. Defendants invite the Court to "review" the Luick email to ascertain what Luick is describing therein. When considering a motion to dismiss, however, the Court cannot, and declines Plaintiffs' invitation to, review the underlying facts or evidence to determine whether Plaintiffs' allegations are true. The Court finds that, for purposes of evaluating the allegations of misappropriation under the motion to

dismiss standard, Plaintiffs' allegations are sufficiently pled.

The Court finds merit in Defendants' <u>uncontested</u> argument that Plaintiffs have not pled a basis for attorney fees or exemplary damages pursuant to their DTSA claim. As Defendants argue, the recovery of attorneys fees and exemplary damages under the DTSA (and the Michigan Uniform Trade Secrets Act) require not only willful misappropriation but also that the misappropriation be conducted with malice. 18 U.S.C. § 1836(b)(3)(C) and (D); M.C.L. § 445.9105. In Paragraph 9 of the Complaint, Plaintiffs allege that Luick's conduct constituted an "intentional and malicious breach of his confidentiality and non-compete agreement with his former employer," but they do not plead any facts to support that conclusory allegation in the DTSA claim (or even allege any "malicious" conduct to support exemplary damages or attorneys fees in the DTSA claim).

It is also undisputed that Xoran did not provide notice of employee whistleblower immunity provisions in the Employment Agreement (or elsewhere). *See* 18 U.S.C. § 1833(b)(3)(A) (requiring employers to provide notice of employee whistleblower immunity provisions in any contract governing the use of trade secrets for award of attorneys fees or exemplary damages). For that reason, Plaintiffs also cannot, as a matter of law, recover attorneys fees or exemplary damages on their DTSA claim.

The Court denies Defendants' request for a more definite statement. It was not made prior to filing responsive pleadings, as their Answer, Affirmative Defenses, and Counterclaim were filed on November 1, 2016, over two weeks earlier. *See* Rule 12(e).

## B. Plaintiffs' Motion to Dismiss Counterclaim

Plaintiffs argue that the clear and unambiguous terms of the Employment Agreement require Defendants to arbitrate Luick's counterclaim for wrongful discharge. The Arbitration Clause of the Employment Agreement provides:

> 9.1 Introduction. Employee and Xoran mutually agree that all Claims (as defined in Paragraph 9.2 of this Agreement) related to the employment relationship (including the termination of employment) that either party may presently or in the future have against the other party shall be submitted to final and binding arbitration before an impartial arbitrator in accordance with the principles of fundamental fairness. This includes claims that Employee may have against Xoran's parent organizations, subsidiaries, officers, directors, or agents. The parties agree that this Arbitration provision shall survive the termination of Employee's employment and shall survive the termination or expiration of this Agreement.

> 9.2 Scope of Coverage. The Claims covered by this Arbitration provision include, but are not limited to: claims for wages, benefits, or other compensation; allegations of wrongful termination, breach of contract, and tort claims; allegations of unlawful discrimination, unlawful harassment, or violations of civil rights under federal, state, or local law; and all other employment-related claim for violation of any non-criminal, federal, state, or other governmental common law, statute, regulation, or ordinance. <u>Employee and Xoran acknowledge that they are waiving their right to sue in court for any alleged civil rights</u>

violations under any federal, state, or local law, and that an arbitrator - not a judge or jury - will decide such claims. The following Claims by Employee against Xoran shall NOT be covered by this Arbitration provision: claims for workers' compensation and unemployment insurance. The following Claims by Xoran against Employee shall NOT be covered by this Arbitration provision: claims by Xoran against Employee seeking injunctive or other equitable relief for alleged violations by Employee of the "Rights to Work Product" Section of this Agreement (Paragraph 5); the "Non-Disclosure of Information" Section of this Agreement (Section 6); and the "Non-Competition" Section of this Agreement (Section 8).

9.3 Procedures and Time In Which to Arbitrate. A party requesting arbitration must send written demand to the other party pursuant to Paragraph 11.3 of this Agreement. In consideration of his/her employment, Employee agrees to initiate any arbitration proceeding arising out of or in any way related to this Agreement, his/her employment, and/or the cessation of his/her employment within one hundred-eighty (180) days after the claim(s) arise(s), or within the applicable statutory limitations period(s) provided by law, whichever occurs first. Employee acknowledges that his/her failure to do so shall act as a bar to any claim that he/she may have, and Employee waives any longer statutory limitations period to the contrary. If either party breaches this Arbitration provision by filing a lawsuit in Court for a claim covered by this Arbitration provision, the other party shall be awarded costs and attorneys' fees as are reasonably necessary to compel arbitration of any claims. Except as provided in this Agreement, arbitration shall be conducted by an impartial arbitrator selected mutually by Xoran and Employee. The party requesting the arbitration shall pay all arbitration filing fees. All other arbitration costs shall be borne equally by Xoran and Employee. The arbitration shall take place in the city in which Employee is assigned to work for Xoran or, in the case of termination, was last employed by Xoran. Each party shall be entitled to retain counsel, and each party shall be responsible for paying the costs and fees of their own counsel. Either party may request that the arbitration proceedings be transcribed, but the requesting party shall pay all transcription fees and costs. The Arbitrator shall issue a written

decision. The Arbitrator may, as part of the written decision, award costs, arbitrator's fees, and attorneys fees, if applicable, to the prevailing party. The Arbitrator's decision shall be final and binding on all parties and a judgment can be rendered upon the Arbitrator's award in any court of competent jurisdiction meaning either party may seek enforcement of the Arbitrator's decision in any court of competent jurisdiction.

Dkt. No. 18, Ex. 1, ¶ 9.1 – 9.3 (emphasis in original). Plaintiffs contend that Luick's counterclaim for termination of employment falls squarely within the Arbitration clause and should be dismissed.

Defendants do not contest that any claims arising from Luick's employment, other than those specifically exempted by the Employment Agreement, must be submitted to binding arbitration. Dkt. No. 24, PgID 840. Specifically, Defendants do not argue that its Counterclaim is not subject to the Arbitration clause. Defendants instead contend that Plaintiffs' motion ignores the fact that some of Plaintiffs' claims (or at least the relief sought) also must be submitted to arbitration under the Arbitration clause. Defendants maintain that by filing some of their non-equitable (arbitrable) claims in this Court, Plaintiffs have waived the application of the Arbitration clause – for Plaintiffs and Defendants.

Defendants assert it is within the Court's discretion to determine if Plaintiffs' litigation conduct is inconsistent with invoking the Arbitration clause such that it constitutes wiaver. Citing *JPD, Inc. v. Chronimed Holdings, Inc.*, 539 F.3d 388, 393,

395 (6th Cir. 2008); *Hurley v. Deutsche Bank Trust Co. Ams.*, 610 F.3d 334, 338 (6 th Cir. 2015) (citation and internal quotation marks omitted) (stating that "a party may waive an agreement to arbitrate by engaging in two courses of conduct: (1) taking actions that are completely inconsistent with any reliance on an arbitration agreement; and (2) delaying its assertion to such an extent that the opposing party incurs actual prejudice.").

Defendants suggest that it would be prejudiced by having to submit to arbitration and incur double expenses. Defendants reiterate that Plaintiffs' conduct in asserting non-injunctive, non-equitable claims against Defendants is grounds for finding that Plaintiffs waived the right to demand arbitration of Defendants' counterclaim based on Luick's employment relationship with Xoran. Plaintiffs have not responded to this argument. This is a reasonable argument, but it is rejected because the more appropriate mechanism would be to require that <u>all</u> of the non-equitable, non-injunctive claims (or the damages portions of such claims) be resolved in arbitration (if a party files such claims in arbitration).[2]

Defendants also argue that the Arbitration clause has unenforceable fee-shifting

---

[2]The Court dismisses Count II of Plaintiffs' Complaint. Count II is a claim for "Injunctive Relief." Injunctive relief is not a freestanding claim, however, but is simply a form of relief. *See Terlecki v. Stewart*, 278 Mich.App. 644, 663 (2008) ("It is well settled that an injunction is an equitable remedy, not an independent cause of action").

and fee-splitting language because those provisions would deter persons from attempting to vindicate their rights in arbitration. Citing *Morrison v. Circuit City Stores, Inc.*, 317 F.3d 646, 658 (6th Cir. 2003) (involving Title VII statutory rights); *Rembert v. Ryan's Family Steak Houses, Inc.*, 235 Mich.App. 118, 124 (1999) (agreement to arbitrate statutory employment claims cannot waive any rights or remedies under the statute and the arbitral process must be fair). Plaintiffs have not responded to this argument. The Court rejects this argument. First, Luick is not an uninformed party. He is a college graduate who entered into the Employment Agreement. Second, the cases he cited had underlying statutory claims, not employment claims. Litigation in those cases was subject to the governing statutes, something that is not present here. Third, the cost-shifting provisions could work in Defendants' favor just as easily as in Plaintiffs' favor.

Defendants argue that, if the Court concludes Luick's counterclaim should be dismissed in favor of binding arbitration, any claim for monetary damages asserted by Plaintiffs against Defendants must meet the same fate. Citing *Decker v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 205 F.3d 906, 911 (6th Cir. 2000). The Court finds Defendants' argument on this issue persuasive, but there is no motion before the Court. The Court will dismiss all claims subject to binding arbitration upon proper

motion or stipulation.[3]

Defendants further suggest that, if the Court determines that arbitration of all non-equitable, non-injunctive claims is appropriate, the Court should stay the proceedings in this Court pending resolution of the parties' issues in arbitration. Citing *Landis v. North American Co.*, 299 U.S. 248, 254 (1936). Plaintiffs have not responded to this argument, but the Court rejects any such stay here. The essence of Plaintiffs' case is to enjoin Luick from using trade secret information and competing with Plaintiffs, and Plaintiffs seek injunctive, equitable relief for such conduct. This is not a case that is appropriate for issuance of a stay in this Court, as it will only serve to avoid resolution of the issues before the Court.

Plaintiffs' Motion to Dismiss Counterclaim is granted.

**C.    Amended Motion for Order to Show Cause Why Defendant Should Not be Held in Contempt**

Plaintiffs ask the Court to order Defendants to show cause why they should not be held in criminal or civil contempt, have profits disgorged, and have sanctions, attorney fees and costs imposed upon them for violation of the Stipulated Order. Plaintiffs assert that Defendants have ignored the Stipulated Order by: (1) continuing to contact Xoran Customers; (2) continuing to solicit Xoran Customers and market

_____

[3] If there are any remaining claims that are subject to binding arbitration, the Court advises that the parties stipulate to the dismissal of such claims.

competitive products; (3) continuing to utilize Xoran product and service pricing in order to compete with Xoran; and (4) continuing to utilize Xoran work product. Based on all of these alleged transgressions of the Stipulated Order, Plaintiffs ask the Court to order immediate disclosure of all of Tungsten's books and records, including business records, billing statements, accounting records, active and pending contracts, and current and prospective customer lists. Defendants assert that no finding of criminal or civil contempt is appropriate because they have not disobeyed, resisted, or violated the Stipulated Order.

Plaintiffs first argue that Defendants began a relationship with Craig Kilgore ("Kilgore") of Charleston ENT and Allergy ("Charleston ENT") on September 14, 2016, a relationship that was ongoing at the time the Stipulated Order was entered. Plaintiffs cite email communications between Kilgore and Xoran employees that reflect that Kilgore had concerns about some of Xoran's scanners, at least one of which Charleston ENT had been paying both Xoran and Tungsten for coverage. Plaintiffs contend that, by receiving payment from Charleston ENT and maintaining an ongoing sales relationship with Chareleston ENT, Defendants directly violated the Stipulated Order.

Plaintiffs next argue that on December 5, 2016, Xoran obtained an email from another current customer, Southwest Allergy & Asthma Center ("Southwest Allergy")

that showed that, after entry of the Stipulated Order, Tungsten had solicited Southwest Allergy for a contract to provide services for Xoran's MiniCAT product, a product specifically noted in the Stipulated Order. In the Tungsten email, Luick compared Tungsten's services and pricing to Xoran's, offered to start in May, and asked "In the meantime, is there any additional information I can provide?" Dkt. No. 21, Ex. 5. Plaintiffs also note that Defendants specifically stated in that email that "Xoran uses a proprietary file format for data archive." Plaintiffs suggests that statement meant that Plaintiffs' format is not publicly available and is trade secret information protected by the Stipulated Order. Plaintiffs argue that the email constitutes a direct violation of the Stipulated Order.

Plaintiffs contend that it received information that Defendants were planning to be on-site at a client of Xoran's in South Carolina in early December. Finally, Plaintiffs state that Defendants have entered into a partnership with a former Xoran business provider (Fusion One) to try to sell web-based data storage and remote retrieval systems to Xoran Customers, in direct competition with Xoran's product XoranConnect, a product specifically addressed in the Stipulated Order.

Plaintiffs argue that Defendants' violations of the Stipulated Order constitute violations of a court order punishable by civil or criminal contempt. "To warrant the imposition of criminal contempt sanctions, a party must willfully violate a specific,

clear, and unequivocal court order." *Downey v. Clauder*, 30 F.3d 681, 686 (6th Cir. 1994) (citing *United States v. West*, 21 F.3d 607, 609 (5th Cir. 1994). The elements for criminal contempt under 18 U.S.C. § 401(3) are that the alleged actor: "(1) had notice of a reasonably specific court order, (2) disobeyed it, and (3) acted with intent or willfulness in doing so." *United States v. Hendrickson*, 822 F.3d 812, 820-21 (6th Cir. 2016) (citation omitted). "For purposes of criminal contempt, 'willfulness' means 'a deliberate or intended violation, as distinguished from an accidental, inadvertent or negligent violation' of a court order." *Id.* at 822.

Alternatively, Defendants request that the Court find Defendants in civil contempt for the above behavior, a finding that warrants punishment with a fine and a term of imprisonment. *Penfield Co. of Cal. v. SEC*, 330 U.S. 585, 590 (1947); Wright, King, & Klein, FEDERAL PRACT. & PROC.: CRIMINAL 2d § 704 at 452 (explaining "the same sanctions, fine and imprisonment, are imposed for civil contempt as for criminal contempt"). "In a civil contempt proceeding, the petitioner must prove by clear and convincing evidence that the respondent violated the court's prior order." *Glover v. Johnson*, 934 F.2d 703, 707 (6th Cir. 1991). If the purpose of the sanction is remedial in nature ("coercing the defendant to do what he had refused to do"), then a civil contempt proceeding is appropriate. *Penfield Co.*, 330 U.S. at 590 (citation and internal quotations omitted). In general, refusing to do an act

commanded is civil contempt while doing a forbidden act is criminal contempt. Wright, King, & Klein, FEDERAL PRACT. & PROC.: CIVIL 2d § 2690 at 367 (citing *Gompers v. Buck's Stove & Range Co.*, 221 U.S. 418, 498 (1911)).

Plaintiffs argue that the prohibition against Defendants "directly or indirectly initiat[ing] contact with any Xoran Customer" has been violated by contacting Kilgore and Southwest. Plaintiffs argue that Defendants violated the requirement that they not "offer to sell a competing product or service to any Xoran Customer, or assist or advise in any such transaction" when partnering with Fusion One to do so – and by contacting Southwest and Kilgore. Plaintiffs further argue that Defendants violated the requirement that they "not use, sell or otherwise disclose information about Xoran's product and service pricing that Luick learned while employed at Xoran" when comparing Tungsten's products and prices to Xoran's in the email to Southwest.

Defendants assert that the service contracts with Charleston ENT were entered into on September 14, 2016, before the lawsuit was filed and before the Stipulated Order was entered. Defendants argue that, once the Stipulated Order was entered, Luick advised Kilgore that Defendants would no longer be able to honor the service contracts and that all payments received after November 1, 2016 would be refunded. Defendants state that: (a) they have not otherwise solicited Charleston ENT; (b) there

are no active or pending contracts between Defendants and Charleston ENT; (c) Defendants did not provide any on-site or remote service to Charleston ENT; and (d) Luick was not involved in any software issue at Charleston ENT, nor did he misuse Xoran administrator credentials, related to Charleston ENT. Defendants also maintain that Luick's scheduled visit to Charleston ENT was for the purpose of looking at <u>purchasing</u> a non-functional machine <u>from</u> Charleston ENT. Defendants submit declarations of Kilgore and Luick as evidence of the purpose of that scheduled trip. For these reasons, Defendants do not believe they have violated the Stipulated Order by maintaining a relationship with Charleston ENT.

Plaintiffs argue that Defendants' response constitutes an admission that Luick competed with Xoran during the non-compete period and earned money doing so. Even if true, this has no bearing on Plaintiffs' motion for order to show cause regarding contempt, as that competition pre-dated November 4, 2016 (and the filing of Plaintiffs' cause of action).

Plaintiffs also argue that the Stipulated Order prohibited Defendants from contacting any Xoran Customers, directly or indirectly. Plaintiffs contend that Defendants never raised the need to contact customers to cancel service contracts before entry of the Stipulated Order, which Plaintiffs suggest Defendants logically would have done if Defendants wanted a provision in the Stipulated Order that

allowed Defendants to do so without violating the Stipulated Order. Plaintiffs further assert that the Stipulated Order does not permit Defendants to contact Xoran Customers at all; by contacting Xoran Customers and telling them Tungsten can work with them after May 2017, he violated the Stipulated Order.

Plaintiffs contend that having a current Xoran Customer (Kilgore) submit a declaration that reveals communications between Luick and Charleston ENT after November 4, 2016 reveals that Luick is "directly or indirectly" contacting Xoran Customers. Plaintiffs state that Defendants could not have cancelled a contract without directly or indirectly contacting the Xoran Customer, nor negotiated the purchase of any equipment from a Xoran Customer. Finally, Plaintiffs argue that Kilgore's declaration stating that Tungsten provides a better option than Xoran for Charleston ENT, a Xoran Customer who Luick serviced while employed by Xoran, only serve to exemplify how Luick has violated the non-compete and Defendants have violated the Stipulated Order.

Plaintiffs argument is not persuasive regarding Charleston ENT. First, Plaintiffs are proposing that Defendants should not have contacted Charleston ENT to terminate the services contracts but instead have continued to violate the Employment Agreement and the Stipulated Order, the very issues Plaintiffs are litigating. Second, the Stipulated Order says Defendants shall not "initiate" contact.

27

It does not appear that Defendants "initiated" any contact regarding Charleston ENT, except to cancel the service contracts.

Defendants claim that they did not initiate contact with Southwest Allergy, as Luick merely responded to requests for information in emails from Southwest Allergy. Defendants argue that Luick's response to Southwest Allergy indicated that Tungsten would not offer any services until May 2017 (after non-compete period expired) and that any discussion of those services wait until May ("Since [Defendants] can start in May for MiniCAT CT scanner service, I can follow-up with you at that time for your Plano and Dennison scanners together. In the meantime, is there any additional information I can provide?"). Defendants suggest that there is no "offer to sell a competing product or service" being made, and that "[n]othing in the Stipulated Order nor the [E]mployment [A]greement prohibits Luick from preparing to compete with Xoran." Citing *Fitness Experience, Inc. v. TFC Fitness Equip., Inc.*, 355 F.Supp.2d 877, 893 (N.D. Ohio 2004) (citation and internal quotation marks omitted) (when addressing a breach of loyalty claim, the court observed that "preparing to compete is qualitatively different than actually competing"). As to Southwest Allergy, it is unclear who initiated the contact, but Defendants appear to be in violation of at least the intent of the Stipulated Order. Unlike in *Fitness Experience*, where the employees did not contact customers or

actually compete with their employer, Defendants did contact Southwest Allergy with the intent to provide Southwest Allergy with services in the future, as evidenced by the language cited above.

Defendants contend that Luick's statement that "Xoran uses a proprietary file format for data archive" does not signal Defendants' use of Xoran work product but instead simply reflects that Xoran uses its own file format for data archiving. Defendants represent that is why Luick said proprietary – to distinguish Xoran's format from Tungsten's – and not indicative of any trade secret information protected by Xoran. Defendants suggest that Plaintiffs' allegations regarding "proprietary" information are made as a basis for the Court to find jurisdiction over this case. The Court finds that Defendants' use of the term "proprietary" was a general term to suggest Xoran had its own format for data archiving, not that Defendants were referencing any trade secret information of Xoran.

Defendants argue that they have not sold or offered to sell any Fusion One product to any Xoran Customer, nor is there a partnership agreement between Defendants and Fusion One. Defendants assert that Plaintiffs have not submitted any evidence that would show an improper relationship exists between Defendants and Fusion One. At this point, without more, the Court agrees with Defendants and the Motion for Order to Show Cause Why Defendants Should Not be Held in Contempt

is denied.

## IV.   <u>CONCLUSION</u>

Accordingly,

IT IS ORDERED that Defendants' Motion to Dismiss **[Dkt. No. 16]** is **DENIED**;

IT IS FURTHER ORDERED that Count II of Plaintiff's Complaint is **DISMISSED**.

IT IS FURTHER ORDERED that Plaintiffs' Motion to Dismiss Counterclaim **[Dkt. No. 18]** is **GRANTED**.

IT IS FURTHER ORDERED that Plaintiffs' Motion for Order to Show Cause why Defendants Should Not be Held in Contempt **[Dkt. No. 21]** is **DENIED**.

IT IS FURTHER ORDERED that Defendants shall advise the Court and Plaintiffs, in writing within 7 days of the date of this Order , of any relationship either of them has with any current or former Xoran Customer.

IT IS FURTHER ORDERED that Defendants are barred from any contact whatsoever with any current or former Xoran Customer for any reason (unless permitted by the Court) prior to the expiration of the non-compete period.

IT IS FURTHER ORDERED that Defendants are barred from communicating

with anyone any details of any Xoran-specific information of which Luick is aware, unless Defendants can produce tangible evidence that such information is publicly available.

IT IS ORDERED.

S/Denise Page Hood
Denise Page Hood
Chief Judge, United States District Court

Dated: September 13, 2017

I hereby certify that a copy of the foregoing document was served upon counsel of record on September 13, 2017, by electronic and/or ordinary mail.

s/Julie Owens Acting in the absence of LaShawn R. Saulsberry
Case Manager